HENRY F. TURNER, Judge pro tem.
Plaintiff, a partnership composed of Frank, Vincent and Charles Orlando, brought this suit for $11,576.74 alleged to be due under a contract under which it had agreed, to furnish and deliver sand to defendant on a state project at Bayou des *143 Allemands, in Lafourche and St. Charles Parishes. The contract, dated December 5, 1960, provides in the pertinent clause:
“Seller agrees to sell to Purchaser, and Purchaser agrees to buy from Seller approximately 225,000 cubic yards of select sand or ‘Select Barrow Item’ on project, which Seller is to deliver to that portion of the approaches to Bayou des Allemands Bridge, here in the State of Louisiana, better known as State Project #5-07-31 and 5-08-21, and Federal A Project #F-216(14), in accordance with the following terms and conditions.
“(a) Seller will furnish and deliver ‘Select Barrow Item’, or Select Sand as specified or called for in the State Projects #5-07-31 and 5-08-21 and Federal A Project #F-216(14) for the State of Louisiana; said project is the approach to Bayou des Alle-mands Bridge, bearing Item #1-4-5. All spreading, grading, and compaction to be performed by the Purchaser and at no time is this contract to be interpreted in any way other than a sale of said ‘Select Barrow Item’ at a site to be designated by Purchaser.
“(g) Seller agrees to haul or deliver an average of 2500 cubic yards per day — this average to be computed on work days only and excluding acts of God and any other unforeseen circumstances beyond control of Seller. It is agreed that the Seller shall deliver not less than 1500 cubic yards per day and if the Seller does deliver less than an average of 1500 cubic yards per day beginning from date of work order until completion of the project, then the Purchaser shall pay $1.04 per cubic yard instead of $1.10 per cubic yard.
“Provided that if the sand which is presently being delivered has to be rewashed or processed, purchaser will bear the expenses, for that. If it becomes necessary to stock-pile or relay same he will also bear this expense. Purchaser has the option of doing the above himself at his expense.”
The contract ran from its date, the plaintiff having delivered pursuant to it from that time, to October 5, 1961, a total of 305 days. By stipulation of the parties, plaintiff delivered a total of 188,231 cubic yards of sand; 181,231 were delivered pursuant to the contract under which plaintiff seeks to recover.
This suit is to recover for sand delivered to the defendant pursuant to the contract at the price of $1.10 per cubic yard, the defendant having paid plaintiff at the lower rate, contending that less than 1500 cubic yards per day were delivered to him.
The Court below decided in favor of plaintiff. Because one sentence in paragraph (g) of the contract provided that seller should work a minimum of six days per week, and the next sentence in paragraph (g) provided for computation of the average amount delivered, he concluded that only six days per week should be counted in determining whether the minimum of 1500 cubic yards per day was met. He also excluded 31 days because of rain, high water, Hurricane Carla and the lack of personnel of defendant on the job. Thirty-two days were omitted for delay caused by investigation by the State as to certain specifications as to quality of sand delivered having been met. Ninety-eight more days were excluded because the State was testing the sand of plaintiff, and it could not be delivered to the job site before having been tested and approved by engineer for the State.
The defendant has appealed the judgment of the Trial Court contending that the lower Court erred in finding that the plaintiff had delivered the minimum of 1500 cubic yards per day pursuant to the contract. The Trial Judge found that from December 5, 1960 to October 5, 1961, there were a total of 305 calendar days. From this figure he subtracted 43 days, as non-work days (no *144 doubt Sundays), leaving a total of 262 working days in that period of time. He found, based on the testimony of the engineer for the State of Louisiana, who had kept a day-to-day diary on the project, which diary was filed in evidence, that no hauling was done for 98 days because the State of Louisiana was testing the sand to be hauled. He found that no hauling was done on 32 days because the State of Louisiana halted the project because of alleged irregularities to be investigated and that no hauling was done for 31 days because of rain, high water, Hurricane Carla and no personnel of defendant on the job site. Subtracting these days, he found that there were only 101 days available to plaintiff as working days. Of course, that number of days divided into the amount of sand hauled would qualify plaintiff to collect the higher price, or $1.10 per cubic yard. The defendant contends that the 43 days (Sundays) should not have been deducted and that the 98 days delay due to the State of Louisiana’s testing of the sand were also improperly deducted.
Conceding that the 43 days (Sundays) deducted were a proper exclusion, if we disallow the 98 days delay caused by the State testing the sand, plaintiff has not met its requirements under the contract. We think the lower Court erred in making both deductions.
Prior to the contract sued upon and as far back as July 26, 1960, this plaintiff and defendant had contracted for the sale and purchase of sand, which contract of July 26, 1960 was amended by an addendum on November 28, 1960. Sand during this period of time was sold by the plaintiff and delivered to the defendant and both parties were thoroughly familiar with the conditions and procedures necessary to be met in order to have the sand tested, delivered and placed on the job site.
While we have studied the entries made in the daily diary kept by the engineer for the State, we are unable to determine therefrom how many days were lost by plaintiff’s inability to haul and deliver sand caused by the State’s testing. However, conceding 98 days were lost due to the testing, it is our opinion that the contract does not allow exclusion of non-work days and days on which defendant was prevented by unforeseen circumstances beyond his control, from delivering in computing the number of average cubic yards plaintiff has delivered for purposes of determining the price to be paid. It will be noted that the first sentence of paragraph (g) of the contract provision quoted above contains an express provision for the exclusion of certain days in determining the amount of sand (2500 cubic yards per day average) to be purchased under the contract. The second sentence (providing for 1500 cubic yards per day average), with which we are concerned, contains no such provision, and we cannot write such a provision into it in the absence of any indication by the parties that such was their intention. There is nothing in this contract or in the testimony of the parties, as to their understanding of it, to indicate that they believed at the time of its execution that such an exclusion should be applicable to the provision or determination of price. We are, thus, constrained to find that the requirement of delivery of 1500 cubic yards per day was to be computed on the total number of days for which the contract was to run with the risk on the seller for its inability to meet this minimum requirement in order to receive a higher price. Having taken this view, it is obvious that 1500 cubic yards per day were not delivered.
There are yet other reasons why we find that the plaintiff failed to meet this requirement. Assuming, for purposes of argument, that the delivery of not less than 1500 cubic yards per day was to be computed on the basis of work days only and excluding days on which the plaintiff was unable to make delivery due to unforeseen circumstances, such as Hurricane Carla, high water, etc., the plaintiff has still not delivered the 1500 cubic yard average. The Trial Court found that 98 days should be *145 excluded in the computation of the average amount delivered, because the State was testing the pits in which plaintiff stored its sand for that period, and it could not deliver the sand to the job site until the sand was found to have met the contract specifications. The record discloses that the plaintiff knew that it would take at least ten days, and possibly more, for the State to inspect each of its storage pits. None of the instances in which the plaintiff’s delivery was delayed by the State inspection did the State take more than sixteen days for testing, and the average time was less than ten days. Thus, the plaintiff should clearly have foreseen most of this delay. It could have provided therefor by having dug additional storage pits for the sand so that it would always have a supply available for delivery while the State was inspecting those in which the sand was last placed by the dredge, pumping it from the river. The plaintiff only provided sufficient pits for this possibility in the last days of its performance of the contract. Plaintiff should have known beforehand that the inspection was necessary prior to delivery, and as the burden was on it to deliver the sand to the job site only after it was found to have met the specifications, its failure to do so can hardly be determined an unforeseen circumstance beyond its control.
The purpose of the placing of a minimum yardage per day on the seller was twofold. In the first place, the defendant also had a time limit for the performance of his contract, with a penalty clause involved, and in the second place, he had to maintain a working crew on certain costly, heavy machinery with which to spread the sand when delivered. He, therefore, gauged his crew and machinery to accommodate the minimum requirements under his sand purchase contract. It logically follows that if that amount was not delivered per day, then his crew and machinery would be idle on the days that an insufficient amount was delivered. Counsel for plaintiff takes the position that the second paragraph of Section (g) of the contract provided for the defendant to build additional pits at his own expense in the event same became necessary. We construe this paragraph to mean that if it became necessary to stockpile the sand at the job site because of the defendant’s inability to spread it as fast as it was hauled to the job site, then it would be up to the purchaser to provide for stockpiling the sand. One of the Orlando brothers, a partner in the plaintiff partnership, so interpreted the provision and testified that he knew it was up to him to provide the additional pits for the sand prior to the testing by the State.
Of equal importance in this regard is the fact that the plaintiff has at no time attempted to show that he could not have delivered the minimum 1500 cubic yards .per day on days other than those required for testing, etc. There were many days on which the plaintiff did not deliver 2500 or even 1500 cubic yards and on which he had no reason for not having done so. It is, thus, not shown that the delay caused by these various factors was the reason or cause of his failure to deliver an average of 1500. The latter part of paragraph (g) of the contract above can hardly be construed as excusing the seller’s inability to deliver 1500 cubic yards per day unless unforeseen circumstances were the cause of seller’s inability to deliver it.
While the defendant in his testimony referred to the differential in the price of $1.04 and $1.10 as a penalty, it is our view that the differential was more in the nature of a bonus to assure prompt and adequate delivery of the sand to the job site. It will be noted that prior to the contract of December 5, I960, defendant had been paying plaintiff $1.02 and $1.04. The additional six cents, of course, was a premium or bonus to avoid unnecessary and costly delay.
For these reasons, the judgment of the District Court is reversed, and plaintiff’s suit is dismissed at its costs.
Reversed.